535 F.Supp. 61 (1982)
Raymond J. DONOVAN, Secretary of Labor, United States Department of Labor, Plaintiff,
v.
DIVISION 788, AMALGAMATED TRANSIT UNION, AFL-CIO, Defendant.
No. 81-698C(B).
United States District Court, E. D. Missouri, E. D.
January 28, 1982.
*62 Bruce D. White, Asst. U. S. Atty., St. Louis, Mo., for plaintiff.
Burton Newman, St. Louis, Mo., for defendant.

MEMORANDUM
REGAN, District Judge.
By this action brought under Title IV of the Labor-Management Reporting and Disclosure Act of 1959, the Secretary of Labor seeks a judgment declaring that the December 11, 1980 election for second vice-president of the defendant union (Division 788) is null and void as violative of section 401(c) of the Act (29 U.S.C. 481(c)) and directing defendant to hold a new election for said office under the supervision of plaintiff. Division 788 represents the bus operators and maintenance personnel employed by Bi-State Development Agency in the operation of a public bus system in the metropolitan St. Louis area.
Section 401(c) of the Act provides, inter alia, that every local labor organization shall comply with all reasonable requests of any candidate for office therein to distribute by mail or otherwise at the candidate's expense campaign literature in aid of such person's candidacy to all its members in good standing. Defendant, a local labor organization as defined in the Act, is alleged to have failed to comply with a reasonable request of a candidate to distribute her campaign literature by mail.
The By-Laws of Division 788 provide in Section 6, Article 1, that in the event more than two candidates have been nominated for any office to be filled at a triennial election, a primary election for that office shall be held. Although called a primary election, it is in effect an elimination contest to narrow the field of candidates for that office to the two top vote getters whose names are then placed in alphabetical order on the general election ballot. However, in the event one of the candidates receives more than fifty percent of the votes cast for that office in the primary, that candidate is elected and that office is eliminated from the general election ballot.
Three candidates having been nominated for the office of second vice-president, a "primary" election was held on December 7, 1980. No candidate received a majority of the votes cast for that office. Sharon Johnson, who received the lowest number of votes was eliminated, leaving as second vice-president candidates for placement on the general election ballot Bernadine Franks (whose complaint triggered plaintiff's investigation) and Charles Warner, the incumbent second vice-president who had received over 46% of the votes cast. The only other office included in the "primary" election was that of president.
Article 5E of Section 5 of the By-Laws of defendant applicable to both primary and general elections provides that candidates for office desiring campaign literature to be addressed and mailed by office personnel must have their literature in the union office no later than 7 days before the election. Ms. Franks was fully aware of this provision as well of the by-law requirement that the general election be held within 10 days after the primary. Pursuant to the latter requirement, the general election was scheduled to be (and was) held on December 11, 1980.
*63 Prior to the primary election, Ms. Franks had prepared and had printed campaign literature which she mailed to about 150 of the approximately 2700 eligible voters. The result of the primary was posted on December 3, 1980, although it became known to Ms. Franks on the evening of December 2. There is no evidence as to when Ms. Franks decided to make a more general distribution of her campaign literature. However, she testified that it was not until sometime on December 5 that she brought any material to the printer. Even so, the union had no knowledge of Ms. Franks' intention to use its facilities to distribute her literature to the membership until she walked into the union office on the afternoon of December 9.[1] This was not more than two hours before the union office was to be closed for the day,[2] and only about 36 hours before the balloting was to commence.
Both the Act and the union's By-Laws (Article 5C of Section 5) confer the right on each candidate to inspect (but not to copy) a list of the names and addresses of all members of the union. There is no allegation (and no proof) that Ms. Franks was denied this right or even that she requested such an inspection.
The complaint simply alleges that in the conduct of the general election of December 11, 1980, the union violated section 401(c) of the Act "by failing to comply with the reasonable request of a candidate to distribute campaign literature by mail at her expense." A requirement virtually identical to that of the Act is set forth in Article 5B of Section 5 of the union's By-Laws which provides that in any election "all reasonable requests of any candidate to distribute campaign literature by mail or otherwise at the candidate's expense, to all members in good standing must be honored."
Neither the Act nor its legislative history provides a standard for determining the "reasonableness" of a request to distribute campaign literature. See Marshall v. Provision House Workers Union, 623 F.2d 1322, 1324 (9 Cir. 1980), which held that the "reasonableness" of a request should be measured in terms of its consistency with the Act's command to unions to conduct free and democratic elections.
The evidence is unclear as to the precise nature of the request made by Ms. Franks. Admittedly, she could not have requested a mailing to all eligible union members if for no other reason than that there are about 2700 members and she testified that she had only about 1800 pieces of campaign literature.[3] It would appear (although she did not so testify) that her intention was to make a selective distribution to about two-thirds of the membership. However, if such was her intention, whatever her request actually was, she did not specify which members were to be sent the literature.
The names and addresses of the union members were on addressograph plates, so that it would have been necessary for some one to segregate the plates of those members who were to be sent the material. How this could be done and what time would be required to do so is left to uncertainty and speculation, particularly absent evidence as to the precise request made by Ms. Franks. Apparently, it was her purpose to operate the addressograph herself or through an associate (e.g. Charles Poiner), rather than by union personnel in view of her testimony that they "wouldn't let me run my literature" and the further evidence of Charles Troupe that Mr. Poiner was being shown by a union officer how to operate the addressograph until he was stopped.
Because of the By-Law prohibition against copying the voting lists, it was essential that before the candidate's envelopes *64 are addressed, they be "stuffed" with the candidate's literature and sealed, and thus be ready for mailing when the stamps are affixed. Charles Troupe (who would appear to have been Ms. Franks' mentor) testified that only about 400 envelopes had been "stuffed" when they were in the union office (but not stamped) so that if, as Ms. Franks testified, she had about 1800 pieces of literature, some 1400 envelopes had not been stuffed and were not eligible for mailing by the union, even if they had been stamped.
We have not overlooked Article 5E of Section 5 of the union's By-Laws which provides that candidates desiring campaign literature to be addressed and mailed by office personnel at the candidate's expense must have their literature in the union office no later than 7 days before the election. However, even though the literal application of the provision would afford a candidate only about two days time to request a union mailing, we believe that a complaint against this provision is unwarranted where, as in this case, the candidate (with full knowledge of the Article) makes no effort to promptly inform the union of her intention to request a mailing, and then does not even bring the stuffed, unstamped envelopes to the union office.
In our judgment Ms. Franks did not make a "reasonable request" for mailing. As noted, she came unannounced to the union office on the afternoon of December 9, with balloting scheduled to commence at 7 a.m. on December 11 (except at one location where balloting was to start at 6 a.m.). It was unreasonable for her to deliberately wait several days until the eleventh hour before making known her desire for a union mailing and then expect the union to drop all its normal activities during the two hours remaining of the business day of December 9 in order to address envelopes which for the most part were empty and none of which had been stamped and without even knowing which members were to be sent her literature. We add that the mailing could not have had any impact on the election unless the postal service delivered the mail and it was received sufficiently in advance of the departure of the members for voting.
Other evidence supports our conclusion that no "reasonable request" was made by Ms. Franks. Aside from the fact that good faith should have impelled her to alert the union several days in advance of December 9 that she wished a mailing to be made, she should, at the very least, have had all her envelopes stuffed, sealed and stamped and ready for immediate mailing when addressed.
We note that there is a hiatus of approximately two hours between the time Ms. Franks was not permitted to "run her literature" and the time Mr. Troupe made Xerox copies of voting lists (after the union's office hours) at about 4-4:15 p.m. There is a conflict in the evidence as to whether the lists he copied were the union's original lists which, in some unexplained fashion, he had surreptitiously obtained, or whether as he testified, that he simply copied some old partial lists of voters containing a total of about 900 names.
We find that the lists which Mr. Troupe copied and which Ms. Franks used for her mailings were the complete original union's lists. The very fact that no attempt to copy any lists was made until after the union's office hours, although the old lists could have been copied some two hours earlier, militates against a finding that Mr. Troupe copied the old lists. So, too, it is difficult to understand why there was any need to copy the old lists at all. They comprised only 8 or 10 separate sheets. And inasmuch as the envelopes were to be addressed with the aid of a number of Mr. Troupe's precinct captains, these old sheets could have been divided among them. Only if the voting lists to be copied were those of the union would it have been necessary to make copies so that the originals could be returned to the union office. Moreover, in light of Mr. Troupe's testimony that three mailings had been made, one in the evening of December 9, one in the early morning of December 10, and a third one later that morning, there is no explanation of why so long a period of *65 time was necessary for the crew of workers to address and stamp the envelopes if there were only about 900 of them, of which 400 had theretofore been "stuffed." We add that none of the 900 other envelopes which Ms. Franks testified she brought to the union office were produced at the trial or otherwise accounted for.
It follows from the foregoing that Ms. Franks did not make and the union did not deny a "reasonable request" by Ms. Franks to distribute her campaign literature by mail in time to affect the result of the election. We further find that even if a prima facie violation of the Act had been proved, the union's refusal in the circumstances of this case did not affect the result of the election.
This Memorandum constitutes our findings of fact and conclusions of law. Judgment will be entered for defendant.
NOTES
[1] Walter Hammerschmidt (the secretary-treasurer of the union), who was a friendly witness for plaintiff, so testified.
[2] The regular office hours of the union were 8:30 to 4.
[3] We do not hold that the request must be for a distribution to all members, although the literal reading of the Act would appear to so mandate. We further note that the literature she desired to (and later did) distribute included literature of a candidate for another office in addition to her own.